# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>HENRY D. MCKNIGHT, JR. (01),<br><br>    Defendant. | Case No. 17-40020-01-DDC |

## MEMORANDUM AND ORDER

On December 24, 2016, Officers Brandon Uhlrig and Zachary Goodman of the Topeka Police Department arrested Henry D. McKnight, Jr. for Lurking and Prowling in violation of Topeka City Code § 9.45.070. During a search following the arrest, Officer Uhlrig found six .40 caliber bullets on Mr. McKnight's person. Minutes before the arrest and search, Officer Uhlrig found a .40 caliber pistol on the ground in Mr. McKnight's vicinity.

Earlier, on December 10, 2015, Mr. McKnight was convicted for Aggravated Battery; Physical Contact/Weapon. This conviction prohibited him from possessing a firearm. Based on evidence that officers had located the pistol, the grand jury indicted Mr. McKnight on one count of possession of a firearm in violation 18 U.S.C. §§ 922(g) and 924(a)(2) on March 8, 2017. On August 4, 2017, Mr. McKnight moved to suppress all evidence about the bullets. Doc. 15. The court held an evidentiary hearing on August 29, 2017. The court has considered the parties' briefings and evidence, and now is prepared to rule. For reasons explained by this Order, the court denies Mr. McKnight's Motion to Suppress (Doc. 15).

**I.    Factual Background[1]**

On December 24, 2016, at approximately 4:10 a.m. Officers Uhlrig and Goodman of the Topeka Police Department responded to an alarm at Paisano's Restaurant in Topeka, Kansas. When they arrived, they saw a person they later identified as Mr. McKnight lying on the ground in front of the restaurant's front door. They were unable to investigate further at that time because they were then called away to another higher priority call. They didn't return to Paisano's until about 4:34 a.m. When they returned, Officer Uhlrig arrived first. When he arrived, the person still was lying in front of the front door, facing the doors.

Officer Uhlrig approached Mr. McKnight, shined a light on him, and announced "Topeka Police." At the announcement, Mr. McKnight rolled over, tried to stand, stumbled, and fell.[2] Then, he got up and started to walk around the building, moving away from Officer Uhlrig. Officer Uhlrig asked Mr. McKnight to sit down on the bench, but he continued to walk away through the patio to the parking lot. Officer Goodman intercepted Mr. McKnight at the parking lot and Officer Uhlrig asked him to sit down again. This time, McKnight complied.[3] Once Mr. McKnight sat down, Officer Uhlrig asked Mr. McKnight his name and if he needed any help, explaining they had been called to the restaurant because the alarm had reported. While Officer Uhlrig spoke with Mr. McKnight, Mr. McKnight pulled his arms out of the sleeves of his

---

[1]   The following facts are taken from the uncontroverted facts of the Motion to Suppress (Doc. 15), the Government's Response in Opposition to the Motion to Suppress (Doc. 18), the videos contained in Jointly Stipulated Exhibit 1, and the testimony by Officers Uhlrig and Goodman during the motion hearing.

[2]   Officer Uhlrig stated that he later learned Mr. McKnight had his arms pulled out of the sleeves of the hooded sweatshirt and into the main body of the sweatshirt. Tr. of Motion Hr'g at 18.

[3]   Officer Uhlrig stated that the repeated attempts to get Mr. McKnight to stop and sit down were orders. Tr. of Motion Hr'g at 45–46. And, he was not free to leave. *Id.* at 49.

sweatshirt once again.  Following this preliminary interaction, Officer Uhlrig walked across the patio to the side patio door to investigate the alarm further.

Using his flashlight, Officer Uhlrig found a handgun lying on the door mat in front of the patio door, a broken door handle on the ground, and the damaged door.  Officer Uhlrig immediately turned back to Mr. McKnight.  Officer Uhlrig then demanded to see Mr. McKnight's hands, had him stand up, and told Mr. McKnight he needed to check Mr. McKnight for weapons.  Mr. McKnight attempted to walk away and Officer Goodman helped secure Mr. McKnight.  Officer Uhlrig checked Mr. McKnight for weapons and found none.  Officers Uhlrig and Goodman had Mr. McKnight sit back down.

Then, Officer Uhlrig went back to searching the area near the patio and front door.  Officer Uhlrig met Sergeant Lam at the front door[4] and they walked back to the patio and the handgun.  Officer Uhlrig secured the handgun and cleared it.  At that point, Officer Uhlrig again demanded that Mr. McKnight stand up and then, placed him under arrest.  Officer Goodman secured Mr. McKnight while Officer Uhlrig cuffed him.  Once Mr. McKnight was secured, Officer Uhlrig searched Mr. McKnight.[5]  Officer Uhlrig found a cellphone, keys, a state probation officer's business card, and six .40 caliber bullets on Mr. McKnight's person.  After completing the search, Mr. McKnight was placed in the back of Officer Goodman's patrol vehicle and transported to the police station for processing.

---

[4]   Officer Uhlrig turned off his body camera while he consulted with Sergeant Lam.  Officer Uhlrig testified that it is common practice to turn off the body camera when consulting with a superior officer.  Tr. of Motion Hr'g at 33.

[5]   Officer Uhlrig stated this search was incident to arrest.  Tr. of Motion Hr'g at 28–29.

3

## II. Analysis

The Fourth Amendment[6] forbids unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). If the defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove the reasonableness of that search or seizure by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). If the court determines that the search or seizure violated the constitution and the law enforcement activity was not objectively reasonable, the court can suppress the fruits and instrumentalities of the search or seizure. *United States v. Leon*, 468 U.S. 897, 918–19 (1984).

Mr. McKnight asserts that the court should suppress evidence of the bullets found on Mr. McKnight's person because the officers did not have reasonable suspicion to detain Mr. McKnight. Additionally, Mr. McKnight asserts that the court should suppress the bullets evidence because the facts do not support the charge for which Mr. McKnight was arrested. The court will address the defendant's arguments and government's responses in chronological order with the facts.

### A. Standing

Mr. McKnight first addresses his standing to challenge the search and seizure of his person. Doc. 15 at 3. Although the government does not contest his standing, the court will address it briefly. The Supreme Court has always recognized that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless

---

[6] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV

4

by clear and unquestionable authority of law." *Terry*, 392 U.S. at 9 (quoting *Union Pac. R.R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). Here, the officers seized and searched Mr. McKnight's person. Therefore, Mr. McKnight has standing to challenge the search and seizure.

**B.     *Terry* Stop**

Mr. McKnight asserts that the court should suppress evidence of the bullets because the officers did not have reasonable suspicion to detain Mr. McKnight. Doc. 15 at 3–6. Law enforcement "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30) (internal quotations marks omitted). "In determining whether reasonable suspicion exists, we look to the totality of the circumstances, rather than assessing each factor or piece of evidence in isolation." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011) (internal quotation marks omitted). "Additionally, we need not rule out the possibility of innocent conduct, and reasonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality." *Id.* "All reasonable suspicion requires is some minimal level of objective justification." *Id.*

"[W]hen determining if a detention is supported by reasonable suspicion, we 'defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Id.* (quoting *Zubia–Melendez,* 263 F.3d at 11620). "We judge the officer's conduct in light of common sense and ordinary human experience and we consider the reasonableness of an officer's actions using an objective standard." *Id.* "Under this objective standard, we ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Id.* The Tenth Circuit has

used additional factors to inform the decision whether the officer had reasonable suspicion to believe criminal activity was afoot. One, "[i]t is well-settled that 'nervous, evasive behavior,' including fleeing from law enforcement, 'is a pertinent factor in determining reasonable suspicion.'" *Id.* at 1258 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Two, our Circuit has held "that the fact that an incident occurred late at night or early in the morning is relevant to the *Terry* analysis." *Id.* at 1257.

Here, considering all circumstances, the court finds that Officer Uhlrig had reasonable suspicion to detain Mr. McKnight. The court analyzes the facts available to Officer Uhlrig when he detained Mr. McKnight. A burglar alarm was triggered at Paisano's. Mr. McKnight was present at the scene of the alarm. And, he still was present at the scene when Officer Uhlrig returned. When Officer Uhlrig approached Mr. McKnight and announced his presence, Mr. McKnight tried to elude him. All of this occurred around 4:30 in the morning. Perhaps no individual fact would have provided Officer Uhlrig reasonable suspicion to stop Mr. McKnight. But, the court evaluates the circumstances in totality and uses common sense. Reasonable suspicion arises when a person is present where an alarm has sounded. That suspicion gets stronger when the person is the only person in the immediate area of the alarm, he has been there for at least 30 minutes, and he attempts to leave as soon as the police arrive. Officer Uhlrig's suspicions have been fine-tuned by nine years of experience with the Topeka Police Department.[7] And it was triggered by what he reasonably suspected was suspicious activity involving Mr. McKnight. The court thus finds that Officer Uhlrig reasonably suspected that criminal activity was afoot and his suspicion was supported by facts he easily and sensibly articulated.

---

[7] Officer Uhlrig testified that he had approximately nine and one-half years of experience as a Topeka Police Officer at the time of the August 29 hearing. Tr. of Motion Hr'g at 6.

## C. Frisk[8]

Once the police stop an individual, they can frisk that individual for weapons to protect the officers if they have reasonable suspicion to believe the individual is armed and dangerous. *Terry*, 392 U.S. at 27. The police can frisk the individual for this limited purpose if a reasonably prudent officer in the same circumstances would believe that the officer's safety or the safety of others was in danger. *Id.* Our Circuit has identified factors that help evaluate whether an officer's suspicion was reasonable: the officer having to turn his back on the defendant; the time of day when the frisk occurred; the place where the frisk occurred; previous encounters the officer has had with the defendant; the defendant's criminal history; the defendant's nervousness; and the defendant's history of drug use. *United States v. Fager*, 811 F.3d 381, 386 (10th Cir. 2016); *see also United States v. Garcia*, 751 F.3d 1139, 1144–47 (10th Cir. 2014). These factors weigh on the totality of the circumstances. *Id.* When weighing the totality of the circumstances, the court must include "an officer's *reasonable* inferences based on training, experience, and common sense." *Id.* (quoting *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007)).

Here, Officer Uhlrig had to turn his back on Mr. McKnight while he was investigating the alarm. During the entire encounter, Mr. McKnight was nervous and, originally, he had tried to elude the officers. And, this encounter took place around 4:30 a.m. in a location that prevented Officer Uhlrig from seeing clearly without his flashlight.[9] In addition to the enumerated factors, other circumstances provided Officer Ulhrig's reasonable suspicion. Mr.

---

[8] The court concludes that defendant and government alike misused the term "frisk" in their Motion and Response, respectively. Officer Uhlrig did frisk Mr. McKnight immediately after discovering the handgun on the ground. But, the parties use the term "frisk" to reference the search that Officer Uhlrig conducted after he arrested Mr. McKnight. The court thus analyzes Officer Ulrig's initial pat down of Mr. McKnight as a frisk despite the officers not finding or seizing any property during the frisk and defendant is not moving to suppress anything obtained during the frisk.

[9] Tr. of Motion Hr'g at 22.

McKnight continually pulled his arms out of the sleeves inside his sweatshirt. Any situation that prevents an officer from seeing a suspect's hands presents an opportunity for danger. Then, Officer Uhlrig found a pistol on the ground near Mr. McKnight's original location. In total, these facts gave Officer Uhlrig reasonable suspicion to believe that Mr. McKnight was armed and dangerous.

### D. Arrest

Mr. McKnight also asserts that the court should suppress evidence of the bullets because the facts do not support the charge for which Mr. McKnight was arrested. Doc. 15 at 6–9. Mr. McKnight was arrested for Lurking and Prowling in violation of Topeka City Code § 9.45.070. This ordinance provides:

> (a) It shall be unlawful for any person to be found lurking, lying in wait or concealed in any house or other building or any yard, premises or street with the intent to do any mischief or to pilfer or to commit any crime or misdemeanor whatever.
>
> (b) It shall be unlawful for any person to loiter at nighttime or prowl around a dwelling house or any other place used wholly or in part for living or dwelling purposes, belonging to or occupied by another. This subsection applies only when a person is on another's property without permission.

Topeka City Code § 9.45.070.

First, Mr. McKnight argues that subsection (b) cannot apply because the Paisano's restaurant is not used wholly or in part for living or dwelling purposes. Doc. 15 at 7. The court agrees with this argument. Next, Mr. McKnight argues that subsection (a) cannot apply because Mr. McKnight was neither awake nor concealed. *Id.* The government counters this argument by saying that Mr. McKnight's presence at the scene of a triggered alarm—regardless of whether he was asleep—where criminal damage had occurred and a weapon was found nearby gave the officers probable cause to believe that Mr. McKnight was there with intent to do mischief or commit some crime. Doc. 18 at 13. The court is convinced by this counter argument.

The prosecutor concedes that Mr. McKnight was asleep when Officer Uhlrig arrived the second time. But, Officer Uhlrig does not concede this point.[10] The court again looks at the facts as Officer Uhlrig received them. A burglar alarm was triggered at Paisano's. Mr. McKnight was present at the scene of the alarm. And, he was still present at the scene when Officer Uhlrig returned. It was approximately 4:30 a.m. Officer Uhlrig was unable to see Mr. McKnight clearly where he was lying.[11] When Officer Uhlrig approached Mr. McKnight and announced his presence, Mr. McKnight tried to elude him. Upon inspecting the building, Officer Uhlrig found a broken door handle, a damaged door, and a handgun.

These facts in totality provided Officer Uhlrig probable cause to arrest Mr. McKnight for violating subsection (a) of the Topeka Lurking and Prowling ordinance. Mr. McKnight's position by the front door concealed him, at least partially. Mr. McKnight was in close proximity to a restaurant where the burglar alarm had sounded. He also was in close proximity to a broken door handle, a damaged door, and a handgun. And, when Officer Uhlrig arrived, Mr. McKnight tried to leave immediately. These facts in totality gave Officer Uhlrig probable cause to believe that Mr. McKnight was lurking "with the intent to do any mischief or to pilfer or to commit any crime or misdemeanor whatever." Officer Uhlrig validly arrested Mr. McKnight.

### E. Search Incident to Arrest

Mr. McKnight does not challenge the search following his arrest as an unconstitutional search incident to arrest and the government does not attempt to justify it on those grounds. However, the court conducts a brief analysis of that issue here. The Supreme Court has found that:

---

[10] Tr. of Motion Hr'g at 53 (Question from defendant's counsel: "But he was actually probably sleeping, right?"; Answer by Officer Uhlrig: "I don't know. I didn't get that close to him to see if he was awake or asleep.").

[11] Tr. of Motion Hr'g at 17.

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule.

*Chimel v. California*, 395 U.S. 752, 762–63 (1969). Here, the court has determined that Mr. McKnight's arrest was a valid one. With a valid arrest, Officers Uhlrig and Goodman could reasonably search Mr. McKnight "to remove any weapons" or "to search for and seize any evidence" on Mr. McKnight's person "to prevent its concealment or destruction." Officer Uhlrig did in fact search Mr. McKnight after he was arrested and found six .40 caliber bullets. Because Mr. McKnight was validly arrested, the court finds that Mr. McKnight's search incident to arrest was valid.

## III. Conclusion

For reasons discussed above, the court denies Mr. McKnight's Motion to Suppress (Doc. 15).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Henry D. McKnight, Jr.'s Motion to Suppress (Doc. 15) is denied.

**IT IS SO ORDERED.**

**Dated this 22nd day of September, 2017, at Topeka, Kansas.**

                                                **s/ Daniel D. Crabtree**
                                                **Daniel D. Crabtree**
                                                **United States District Judge**